1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                   FOR THE EASTERN DISTRICT OF CALIFORNIA

8    CHARLES H. CARR, JR.,

9                 Petitioner,              No. 2:05-cv-1870 MCE JFM (HC)

10         vs.

11   JEANNE WOODFORD, BOB HOREL,
     Acting Warden,
12

13               Respondents.

14   _____/

15   CHARLES H. CARR,

16                 Petitioner,              No. 2:05-cv-1871 MCE JFM (HC)

17         vs.

18   BOB HOREL, Acting Warden,

19               Respondents.

20   _____/

21   CHARLES H. CARR,

22                 Petitioner,              No. 2:04-cv-0584 MCE JFM (HC)

23         vs.

24   D.K. SISTO,

25               Respondent.

26   _____/

1

1

<u>FINDINGS AND RECOMMENDATIONS</u>

2          Petitioner is a state prisoner proceeding through counsel with three applications

3 for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  These applications challenge the 2002

4 and 2004 denials of parole, and the 2003 Governor's reversal of the grant of parole, but all rely

5 on the same evidence.  Accordingly, the court will begin its analysis with the Governor's reversal

6 of the grant of parole.

7          Petitioner is serving a sentence of life with the possibility of parole[1] following his

8 1969 Butte County conviction on charges of first degree murder.  In Case No. 2:05-cv-1870,

9 petitioner challenges the Governor's October 17, 2003 reversal of the May 22, 2003 decision by

10 the California Board of Prison Terms ("Board") finding petitioner suitable for parole.  (Answer,

11 Exs. 3 & 4.)  Petitioner contends that there was no evidence to support the Governor's decision

12 that petitioner continues to pose an unreasonable risk of danger to society, and that the denial was

13 a violation of petitioner's due process rights.  Petitioner is 62 years old (answer, ex. 5), and has

14 served over 35 years in state prison.  The Board assessed petitioner's prison term at 148 months

15 (pet., Ex. A, at 52-53); thus he has served over 23 years beyond his minimum eligible parole

16 date.

17          This court finds that the continued denial of parole, nineteen different times by the

18 year 2004, based on the unchanging factors of petitioner's childhood, his commitment offense

19 and his criminal history, has violated petitioner's due process rights, and recommends that the

20 habeas petition be granted.

21 /////

22 /////

23 /////

24

---

25          [1]  Petitioner was initially sentenced to death, but on January 4, 1973, his death sentence
26 was modified to a life sentence with the possibility of parole by the California Supreme Court.
(Answer, Ex. 2.)

1                                                      ANALYSIS

2 I.  <u>Standards for a Writ of Habeas Corpus</u>

3               Federal habeas corpus relief is not available for any claim decided on the merits in

4 state court proceedings unless the state court's adjudication of the claim:

5           (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
6           determined by the Supreme Court of the United States; or

7           (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
8           State court proceeding.

9 28 U.S.C. § 2254(d).

10               Under section 2254(d)(1), a state court decision is "contrary to" clearly

11 established United States Supreme Court precedents if it applies a rule that contradicts the

12 governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

13 indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

14 result.  <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (<u>citing</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406

15 (2000)).

16               Under the  "unreasonable application" clause of section 2254(d)(1), a federal

17 habeas court may grant the writ if the state court identifies the correct governing legal principle

18 from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

19 prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ

20 simply because that court concludes in its independent judgment that the relevant state-court

21 decision applied clearly established federal law erroneously or incorrectly.  Rather, that

22 application must also be unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, __ U.S. __, 123

23 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review

24 of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

25               The court looks to the last reasoned state court decision as the basis for the state

26 court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

1   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

2   habeas court independently reviews the record to determine whether habeas corpus relief is

3   available under section 2254(d).   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

4   　　　　Petitioner contends that there was no evidence to support the Governor's decision

5   to reverse the grant of a parole date and that the decision was contrary to applicable provisions of

6   state and federal law.  Petitioner further claims that there was substantial evidence to support

7   application of the suitability factors to him, and that the evidence showed he would pose very

8   little danger to the community if released.

9   　　　　The Board's May 22, 2003 parole decision, reversed by the Governor on October

10  17, 2003, was made at a subsequent parole consideration hearing.  (See Exhibit 4 to Answer to

11  Petition for Writ of Habeas Corpus, filed December 20, 2006.)  In his decision, the Governor

12  concluded the following:

13  　　　　Petitioner "continues to pose an unreasonable risk of danger to society."

14  　　　　(Ex. 3 to Answer, at 13-16.)  The Governor relied principally on petitioner's

15  　　　　commitment offense and criminal record, noting that during petitioner's second

16  　　　　escape from prison in 1977 he again hit an elderly man over the head, which is

17  　　　　how petitioner killed his first victim in 1969.  (Id. at 14.)  Despite the fact that

18  　　　　petitioner's "conduct in prison has sometimes been good and even exemplary in

19  　　　　some respects, he has also engaged in serious incidents of misconduct."  (Id.)  It

20  　　　　was troubling that petitioner told a 2003 Board panel that he had "taken to the

21  　　　　Board 20 years of clean time, disciplinary free," because he failed to acknowledge

22  　　　　"serious incidents of misconduct prior to that time, including his two successful

23  /////

24  /////

25  /////

26  /////

escapes,[2] a later escape attempt[3] and a serious disciplinary report in 1983 for possession of cash related to his sale of cigarettes to fellow inmates. (Id.) Petitioner had received three reports for minor misconduct within the past 20 years, including one as recent as 2000. (Id.) Petitioner continues to pose an unreasonable risk of danger to society based on petitioner's history of institutional behavior. (Id.)

The Governor also based his reversal on evidence suggesting petitioner's serious gambling addiction had not been addressed, particularly considering the 1969 murder was the result of his addiction to gambling and the 1977 robbery was committed to obtain money to offset gambling losses. (Id.) He discounted recent psychosocial evaluations as unreliable because the 2003 report failed to address petitioner's childhood abuse and the 2001 report reflected petitioner denied he suffered childhood abuse, despite the 1991, 1993, 1994 and 1997 psychological evaluations that noted he suffered childhood abuse. (Id. at 15.) None of the recent psychiatric reports explained the "abrupt turnabout in the findings in the most recent reports" from petitioner's 1991 Psychological Evaluation indicating petitioner needed therapy to

> include exploration of all predisposing factors, from excessively harsh parental discipline, exposure to gambling as accepted social behavior, high value placed on material and financial symbols, to lack of family emphasis on saving, planning, and budgeting. He

/////

---

[2] While held in jail, petitioner escaped by scaling a wall around the exercise yard. Petitioner was found hiding in a tree about twenty minutes later. (Docket No. 23-2 at 12.) In 1973, petitioner allegedly sawed through the bars of his cell window and escaped with two other inmates. (Docket No. 23-2 at 13.)

[3] On March 10, 1978, prison guards noticed the bars of petitioner's cell had been cut. (Docket No. 23-2 at 13; Docket No. 38-4 at 50.) Petitioner received a 115 for violation of 15 C.C.R. Section 3005, a provision requiring inmates to follow prison rules. (C-File at 485.) The San Joaquin County District Attorney's Office declined to prosecute petitioner for attempted escape based on insufficient evidence. (C-File at 483.)

1           also needs to identify high risk situations and viable coping
2           responses for himself in order to abstain from gambling.

3   (Id. at 16.)  Recent reports also failed to address the 1998 and 1999 Life Prisoner

4   Evaluation Reports that concluded petitioner posed an unpredictable degree of

5   threat to the public.  (Id.)  Petitioner failed to address and resolve issues through

6   self-help programs such as VORG and NA, specifically citing the 2002 Board's

7   concerns that petitioner "never seemed to really get to [his] innermost feelings.

8   That [petitioner] just ha[sn't] quite gotten it."  (Id.)

9        The fifth reason the Governor found petitioner still poses an unreasonable

10   risk of danger to society was based on petitioner's past and present attitude toward

11   his crimes.  (Id.)  Although petitioner has since 1997 expressed remorse for killing

12   the victim, petitioner had offered varying statements concerning the murder prior

13   to 1997.  (Id.)  The most recent psychiatric report was flawed because it

14   erroneously stated petitioner had always admitted responsibility for his crime.

15   (Id.)  Recent psychosocial evaluations failed to reflect any change or progress on

16   petitioner's "key psychological defense mechanisms revolv[ing] around denial,

17   externalization, and projection, . . . [or] inflexibility and rigidity."  (Id.)

18        The sixth reason the Governor cited was that petitioner's parole plans were

19   inadequate because "without solid parole plans, [petitioner] poses an unreasonable

20   risk of danger to society."  (Id. at 17.)  The Governor opined that "[i]n the absence

21   of solid employment plans, and with his gambling addiction issues not addressed,

22   he could easily find himself in a desperate financial situation and return to

23   criminal activity as a means of support."  (Id.)

24        By stark contrast, in 2003, the Board found petitioner did not pose an

25   unreasonable risk of danger to society or a threat to public safety if petitioner were released from

26   prison.  (Answer, Ex. 4 at 47; Pet., Ex. A at 47.)  The Board specifically found petitioner had

no juvenile record of assaulting others.  While imprisoned, he has enhanced his ability to function within the law upon release through participation in educational programs.  He acquired his GED early on.  He also participated in college courses.  Through his participation in self-help and therapy programming, and including one-on-one therapy, the rigorous CCat-X program, through MVP, Men's Violence Prevention, VORG, and many years with NA, Narcotics Anonymous.  He's enhanced his ability through vocational programs, having acquired his certification as an Electrician, as well as his many years serving in institutional job assignments, relative to his performance as a Clerk, where he always received exceptional work reports.  He, because of maturation, growth, and greater understanding, has a reduced probability of recidivism.  And he has realistic parole plans, which include family support.  He has maintained close family ties while imprisoned via letters.  And he has maintained positive institutional behavior, which indicates significant improvement in self-control.  And I would note for the record that this includes a total of four 115s over the course of – over 30 years, and the last 115 was a little over 20 years ago.  And he shows signs of remorse.  He has indicated that he understands the nature and the magnitude of the offense and accepts responsibility for the criminal behavior and has a desire to change towards good citizenship.  And although he didn't speak to the Panel today about his remorse, it is contained sufficiently, in the Panel's mind, in the various reports in the files.  The psychiatric report, dated February 25th, 2003, by John T. Rouse, . . . Ph.D., appears to support release.  Dr. Rouse says:

> "Whatever anti-personality traits he has had prior to his incarceration has lessened significantly.  And he seems to have made significant gains in understanding his life crime, as well as his life prior to his incarceration.  He has, as reported by other examiners, compiled a record of conformity, stability, and productivity and as such, [petitioner] no longer presents as a risk to the community.  His risk of dangerousness at this point is negligible and less than that of the average inmate incarcerated here at CSP, Solano."

The previous report done by Dr. Dean J. Clair, . . . really no date on it, but it's for the Subsequent number 16, March 2001 hearing, also appears to support release.  I believe I said that.  The doctor writes under Assessment of Dangerousness:

> "Looking back, there is nothing positive that can be found in either the nature of the crime or the inmate's lifestyle at that stage of his development.  He was a predator with few apparent redeeming social qualities.  He followed this crime up with an escape and with an eventual capture in the process of committing still another crime against property.

7

1

2

3

4

5

> Now, in arriving at his fifties, the inmate has progressed remarkably.  He has compiled a record of conformity, stability and productivity, as described above.  He has impressed both his family and others with his eagerness to put his life together and to function as just another member of the community.  He is mentally stable and has never been significantly addicted.  As before, the writer feels that this man is no longer dangerous."

6   (Id. at 47-50.)  The Board assessed petitioner's prison term as 148 months, after crediting

7   petitioner for periods of good behavior.  (Id. at 52-53.)  The Board's Decisional Review Unit

8   reviewed and approved the Board's decision.  (Pet., Ex. B.)

9            The last reasoned opinion by a California state court was issued by the Solano

10  County Superior Court on January 15, 2004.  (Answer, Ex. 6.)  The state court denied the petition

11  for writ of habeas corpus with the attached comment:

12

13

14

15

16

17

18

19

> The court applies the "some evidence" standard when reviewing the Governor's decision to reverse a finding of the board of Prison Terms.  (**In re Rosenkrantz** (2002) 29 Cal.4th 616, 666[.]  The governor's decision will be upheld so long as there is some basis in fact to support the decision.  Additionally, "The nature of the prisoner's offense, alone can constitute a sufficient basis for denying parole."  (**In re Rosenkrantz** (2002) 29 Cal.4th 616, 682)[.]  The Governor found that petitioner "continues to pose an unreasonable danger to public safety if released at this time."  The Governor based this finding, in part, on the commitment offense in which petitioner beat an elderly man to death with a hammer.  These facts provide "some evidence" in the record to support the governor's decision.  Accordingly, this petition for writ of habeas corpus should be denied.

20  (Answer, Ex. 6, at 2.)

21           A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

22  some transgression of federal law binding on the state courts, see Middleton v. Cupp, 768 F.2d

23  1083, 1085 (9th Cir.1985), and is unavailable for alleged errors in the interpretation or

24  application of state law, see Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  For this reason,

25  petitioner's claims arising out of alleged violations of state law are not cognizable in this federal

26  habeas corpus action.

1         California's statutory scheme governing parole "creates in every inmate a

2    cognizable liberty interest in parole which is protected by the procedural safeguards of the Due

3    Process Clause." Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); see also Sass v.

4    California Board of Prison Terms, 461 F.3d 1123, 1127-28 (9th Cir. 2006).

5              [T]he Supreme Court ha[s] clearly established that a parole board's
             decision deprives a prisoner of due process with respect to this
6            interest if the board's decision is not supported by "some evidence
             in the record," Sass, 461 F.3d at 1128-29 (citing Superintendent v.
7            Hill, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985));
             see also Biggs, 334 F.3d at 915 (citing McQuillion, 306 F.3d at
8            904), or is "otherwise arbitrary," Hill, 472 U.S. at 457, 105 S.Ct.
             2768.

9

10   Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007).

11        When reviewing a decision of the Board of Parole Hearings or the Governor

12   regarding a prisoner's suitability for parole, the relevant inquiry is "whether some evidence

13   supports the decision . . . that the inmate constitutes a current threat to public safety, and not

14   merely whether some evidence confirms the existence of certain factual findings." In re

15   Lawrence, 44 Cal.4th 1181, 1212, 82 Cal.Rptr.3d 169 (2008).  The Board and Governor both

16   have authority to resolve conflicts in the evidence and decide the weight to be given to particular

17   evidence, and each has broad discretion that will only be disturbed when due consideration is not

18   given to the specified factors.  Id. at 1204, 82 Cal.Rptr.3d 169.

19        In addition, the Board and Governor may rely on the nature of the commitment

20   offense as a basis to deny parole, but only when, considered in light of other facts in the record,

21   the offense continues to be predictive of current dangerousness.  Id. at 1221, 82 Cal.Rptr.3d 169;

22   Cal.Code Regs., tit. 15, § 2402; see also Irons, 505 F.3d at 854 ("[I]n some cases, indefinite

23   detention based solely on an inmate's commitment offense, regardless of the extent of his

24   rehabilitation, will at some point violate due process, given the liberty interest in parole that

25   flows from the relevant California statutes."); Biggs, 334 F.3d at 917 ("A continued reliance in

26   the future on an unchanging factor, the circumstance of the offense and conduct prior to

                                            9

1  imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could

2  result in a due process violation.").

> [T]he Board or the Governor may base a denial-of-parole decision
> upon the circumstances of the offense, or upon other immutable
> facts such as an inmate's criminal history, but some evidence will
> support such reliance only if those facts support the ultimate
> conclusion that an inmate continues to pose an unreasonable risk to
> public safety. [Citation.] Accordingly, the relevant inquiry for a
> reviewing court is not merely whether an inmate's crime was
> especially callous, or shockingly vicious or lethal, but whether the
> identified facts are probative to the central issue of current
> dangerousness when considered in light of the full record before
> the Board or the Governor.

9  In re Lawrence, 44 Cal.4th at 1221, 82 Cal.Rptr.3d 198.  Facts relevant to determining the

10  predictive value of the commitment offense include the amount of time since the offense, the

11  prisoner's history before and after the offense, and the prisoner's current demeanor and mental

12  state.  In re Lawrence, 44 Cal.4th at 1211, 1214, 1219, 1221, 82 Cal.Rptr.3d 169.

13  First, the court must look to the last reasoned state court opinion to determine if it

14  was an unreasonable application of the facts or contrary to controlling principles of United States

15  Supreme Court authority.  Here, unfortunately, the Superior Court decision is barely more than a

16  pro forma denial.  (Answer, Ex. 6.)  The Superior Court decision denies the petition and appends

17  an eleven-line "comment" that concludes there is some evidence, based solely on the

18  commitment offense, to support the governor's decision.  (Answer, Ex. 6.)  This opinion

19  provides nothing to evaluate as it is simply a conclusion without analysis.

> "[D]ue consideration" of the specified factors requires more than
> rote recitation of the relevant factors with no reasoning establishing
> a rational nexus between those factors and the necessary basis for
> the ultimate decision-the determination of current dangerousness.
> "It is well established that a policy of rejecting parole solely upon
> the basis of the type of offense, without individualized treatment
> and due consideration, deprives an inmate of due process of law."

24  In re Lawrence, 44 Cal.4th at 1210, 82 Cal.Rptr.3d 168, quoting Rosenkrantz, 29 Cal.4th at 684.

25  Accordingly, this court must conduct an independent review the record.  Delgado v. Lewis, 223

26  F.3d 976, 982 (9th Cir. 2000).

1          Petitioner was received in state prison on May 12, 1969, following his conviction

2   of first degree murder.  (Ex. 1 to Answer.)  Petitioner was initially sentenced to death, but on

3   January 4, 1973, his death sentence was modified to a life sentence with the possibility of parole

4   by the California Supreme Court.  (Id.)  Petitioner's initial parole consideration hearing was held

5   on January 23, 1979, at which time parole was denied for a period of one year.  (Ex. 2 to Answer,

6   at 2.)  The Board's May 2003 decision was made at petitioner's eighteenth parole hearing.

7   (September 26, 2006 Supp. Briefing, at 12.)[4]

8          As noted above, the Governor relied principally on the commitment offense, his

9   criminal history (both prior to the commitment offense and after), and institutional behavior to

10  support the denial of parole.  The record reflects that there was some evidence before the

11  Governor to support the description of petitioner's commitment offense and his criminal history.

12  However, petitioner claims that these unchanging factors alone are insufficient to support a

13  finding of present dangerousness required to justify the denial of parole.  Specifically, petitioner

14  contends that he has been free from serious disciplinaries since 1983, the last time he incurred a

15  115 disciplinary, and his most recent act of violence was the 1977 robbery, over thirty years ago.

16  Petitioner argues the evidence shows he poses little threat to the community.

17         Indeed, the record before the Board at the time of the 2003 hearing contains

18  substantial evidence contrary to the Governor's conclusion that petitioner would pose an

19  unreasonable risk of danger to society.

20         Petitioner was born on July 3, 1946, and was the oldest of eight children.  (Pet'r's

21  Supp. Brief, at 4 [docket no. 20].)  Petitioner's parents "became very religious and puritanical in

22  their views" when petitioner was 14 years old, forbidding their children from reading magazines,

23  going to movies or dating.  (Id.)  Petitioner "has acknowledged that his parents were strict

24  _____

25         [4]  On August 11, 2004, the Board denied petitioner parole for a period of two more years.
    Carr v. Horel, CIV S-05-1871 MCE JFM P.  A court may take judicial notice of court records.
26  See MGIC Indem. Co. v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986); United States v. Wilson,
    631 F.2d 118, 119 (9th Cir. 1980).

disciplinarians who sometimes used corporal punishment which today would be considered abusive." (Id.) Petitioner enlisted in the United States Marines, working in warehousing and supplies for two years. (Id.) Petitioner was discharged with an "Other than Honorable Discharge" after serving a six month sentence for stealing an 8 mm movie camera and suffering other disciplinary problems while housed in the military prison. (Id.) Petitioner returned to civilian life in 1966 and sustained no criminal offenses, other than traffic violations, until his commitment offense in 1969. (Id. at 5.)

Petitioner has spent almost thirty-five years in prison. Petitioner was 57 at the time of his 2003 parole hearing and will be 63 in 2009. Although petitioner admittedly got off to a rocky start during his initial years of incarceration, he began to turn his life around in 1984. In 1987, he received a laudatory chrono for informing CDC staff of a prison-made knife, or shank, he found in a dental clinic file cabinet while working as a clerk in the clinic. (Pet., Ex. A, at 42-43.) In 1991, petitioner was commended for pointing out a prison employee's misplaced wallet containing cash, credit cards and identification. (Supp. Brief, C-File, at 723.)

Petitioner has participated in numerous prison programs, demonstrated his ability to work hard, and made positive contributions at the prison. In 1990, petitioner completed 30 hours of program participation in a self-help program called "Breaking Barriers." (Supp. Brief, C-File at 732, 2177.) Since January of 1992, petitioner has been a member of the Victims/ Offenders Reconciliation Group ("VORG"). (Supp. Brief, CDC, at 51, 96, 100, 106; C-File, at 614, 680.) In 1994, the Catholic Chaplain who facilitated VORG noted petitioner's participation had "served not only himself but the group at large. VORG looks forward to his continued attendance." (Supp. Brief, C-File, at 680.) In 1993, petitioner successfully completed the following VORG workshops: Stress Management, Decision-Making and Conflict Resolution, Parenting Skills and Values Clarification. (Supp. Brief, C-File, at 704, 2182.)

Petitioner has participated in Narcotics Anonymous consistently and actively since 1990. (Supp. Brief, CDC at 36-37, 68-69, 92- 96, 100, 111, 115; C-File at 555-56, 559-60,

562, 570-71, 603, 607, 609 & 612.)  Petitioner's Narcotics Anonymous sponsor has frequently

noted that petitioner "has been an active participant and has shown an honest desire to help

himself through the self-help program."  (Supp. Brief, CDC at 87, 98, 105; C-File at 612-13.)

Petitioner has acknowledged his gambling addiction and "been awakened to the amount of

damage  to the community and to the individual caused by gambling."  (Psychological Report,

Pet., Ex. J, at 2-3.)  Petitioner acknowledged that gambling was an addiction for him much like

drinking alcohol is an addiction for an alcoholic, and that he needs to forever abstain from

gambling.  (Id. at 3.)

          In 1999, petitioner successfully completed the Men's Violence Program seminar.

(Supp. Brief, CDC, at 69.)  This program was described as follows:

>          an extensive training seminar and self-help group for men who
>          want to end their violence. . . .  Specific procedures for handling
>          and averting the expression of violence is taught.  Accompanying
>          signs of anger are studied and techniques for changing attitudes are
>          learned.

(Supp. Brief, CDC, at 605.)

          Petitioner earned his high school diploma in prison in 1972.  Prior to February,

1993, petitioner participated in the Solano College Sociology Program.  (Supp. Brief, C-File at

705.)  In 1991, petitioner received an "A" in a three unit Introduction to Computers class.  (Supp.

Brief, C-File at 716.)  In 1992, petitioner received an "A" in Sociology I," and his professor

stated petitioner was "very interested, motivated and did all of his homework.  He really paid

attention.  A very rewarding student to teach."  (Supp. Brief, C-File, at 717.)[5]

          From 1989 to 1990, petitioner successfully completed several units within a

Vocational Industrial Electric class and his "progress . . . [was] above average."  (Supp. Brief,

CDC, at 101, 104; C-File at 727, 2178-81.)  In 1992, petitioner earned a certificate of completion

for a Residential-Electrical Wiring program.  (Supp. Brief, C-File, at 711, 2648.)  That same

---

[5]  Due to budget cuts, this program was terminated in 1993.  (Supp. Brief, C-File at 705.)

1  year, petitioner received a Certificate of Achievement for work in Electricity 3, DC Motors, and

2  Vocational  Industrial Electric.  (Supp. Brief, C-File, at 2647.)  The instructor noted that

3  petitioner "has consistently demonstrated good study habits, work performance and an excellent

4  attendance record.  (Supp. Brief, C-File at 845.)  Petitioner was also commended in 1992 on his

5  success in installing fluorescent lights in the Vocational Welding Shop.  (Supp. Brief, C-File at

6  712.)  His instructor observed that petitioner "had a professional demeanor, cleaned up after the

7  job, and ended up with a satisfied customer.  Keep up the good work."  (Id.)

8          From September of 1989 to the present, petitioner maintained Medium A custody

9  status,[6] worked at various positions within the Department of Corrections, received reports

10  ranging from exceptional to satisfactory from his supervisors, and had no serious rules violations.

11  (Supp. Brief, CDC at 36-37, 42-43, 48-49, 50, 56, 62, 68, 74, 79, 86, 88, 98, 104, 111 & 115.)

12  From 1982 to 1983, petitioner worked as an Occupational Therapy Aide; his supervisor

13  described petitioner as

14          a consistently excellent worker.  Carr has a wide range of
          capabilities which he was able to utilize to some degree while
15          working in the O.T. Shop.  He gets along exceptionally well with
          both Staff and Inmates, and is a capable teacher of Crafts.  Carr
16          was also extremely valuable in keeping the Shop a peaceful place
          in which to work . . . .  In working with the A-3 inmates, Carr was
17          kind, attentive, and demonstrated a great deal of self-control.  He
          was the best aide who has ever worked in the O.T. PTU Shop, and
18          his work is greatly appreciated.

19  (Supp. Brief, C-File, at 779.)  In 1985, petitioner worked in the CMF-South law library.

20  Petitioner received an "excellent" performance rating and his supervisor noted petitioner was

21  important to the effectiveness of the library and described petitioner as "dependable,

22  conscientious, and responsive to inmate and staff needs."  (Supp. Brief, C-File at 862-63.)

23

24          [6]  On August 4, 1997, petitioner's case was reviewed for Close B custody criteria and,
   pursuant to a CDC-wide directive affecting all inmates with a prior escape, he was assigned to
25  Close B custody.  Effective December 19, 1997, petitioner's case was re-reviewed per current
   Close B custody criteria and his custody was reduced to Medium A custody.  (Supp. Brief, CDC,
26  at 80.)

1        From 1986 to 1987, petitioner worked in P.I.A. micrographics, and his supervisor

2   noted petitioner had:

3            shown the ability to get along well with his peer employees as well
             as all free staff personnel alike within his place of assignment.
4            Throughout the period he has been assigned, Mr. Carr has never
             shown any type of negative behavior, and he has always been very
5            polite and courteous to everyone.  His demonstrated work
             performance and applied skills are "above average", . . . .  Along
6            with performing all tasks in a diligent manner, Inmate Carr does
             not have any problem accepting instruction from our Production
7            Leadmen or his Supervisor . . . [he] has shown enthusiasm in
             learning all aspects of this highly technical professional field.
8

9   (Supp. Brief, C-File, at 764.)

10       During petitioner's previous work as a clerk, petitioner received excellent work

11  reports.  Between 1987 and 1989, petitioner worked as a clerk in the dental department of Old

12  Folsom prison, where he again received an "exceptional" grade in all areas of performance and

13  attitude.  (Supp. Brief, C-File, at 755, 856.)  His supervisor described petitioner as "an asset to

14  the dental office.  Continue[s] to get the job done."  (Id.)  In 1990, his supervisor noted petitioner

15  "has a strong work ethic.  He is well-mannered, exhibits a willingness to accommodate reception

16  center staff in any assignments that may arise, while maintaining a positive attitude."  (Supp.

17  Brief, C-File at 729.)  Another supervisor noted in February of 1991 that petitioner "demonstrates

18  an uncommon demand to get the most out of his work product."  (Supp. Brief, C-File at 851.)  In

19  May of 1991, a Work Supervisor's Report "commented highly" on petitioner's "clerical skills

20  and work assignment participation."  (Supp. Brief, CDC at 111.)  Petitioner's supervisor wrote

21  petitioner was an "excellent unit clerk.  Helped unit run very smooth and organized.  Maintained

22  records, typed reports, and was an asset to the unit."  (Supp. Brief, C-File at 849.)

23       A Prison Industries Administrator wrote petitioner a laudatory chrono in May of

24  1995, stating that petitioner

25           is to be commended for the excellent job performance.  He has
             displayed a sense since his assignment in May 1994.  During this
26           time, inmate Carr has learned all phases of the PIA Accounting

15

1
2
3

> Procurement Department.  This has allowed Carr to be able to fill
> in when another inmates [sic] were not at works [sic].  Carr has
> continuously displayed excellent work habit in all assignments
> given to him.  He has worked well with other inmates and staff,
> and he is an asset to CSP-SOL, PIA Administration Operations.

4   (Supp. Brief., CDC at 91; C-File at 645.)

5          Prison records also demonstrate that petitioner benefitted from therapy while in

6   prison.  In 1969, petitioner refused to be interviewed by psychiatric department members.  On

7   September 30, 1969, the neuropsychiatric committee provided an examination summary "based

8   on information obtained from the records of the probation officer, court appointed psychiatrists

9   and Navy records; also the communications he has had with fellow inmates, with the supervisory

10   [personnel] and [their] consultations with medical, custodial and other personnel who [were] in

11   contact with [petitioner]."  (Docket No. 35-2 at 1.)  Petitioner was diagnosed as having

12   "Sociopathic Personality, Dyssocial Type.  He also has been called Emotionally Unstable, with

13   Passive-Aggressive, Paranoid and Antisocial Elements."  (Id.)  The committee declared petitioner

14   was not insane.  (Id.)

15          In 1990, the Board referred petitioner to the "Category X" program.  (Supp. Brief,

16   C-File at 733.)  On April 30, 1990, petitioner was diagnosed with Simple and Social Phobia that

17   caused him to panic in certain situation, but as part of his treatment learned "Progressive

18   Relaxation and Desensitization techniques."  (Supp. Brief, C-File at 733 & Docket No. 34-3 at

19   16.)  His treating physician noted that petitioner's "motivation has been high and progress[ed]

20   about 75% when treatment had to be stopped due to my job change."  (Supp. Brief, C-File at

21   733-34 & Docket No. 34-3 at 16.)  The doctor noted that petitioner did not appear to have a

22   diagnosable personality disorder and that his mental status was stable.  (Supp. Brief, C-File at

23   734 & Docket No. 34-3 at 16.)

24          On March 11, 1991, Ranald Bruce, Ph.D. provided a Category X Psychological

25   Evaluation, specifically addressing questions posed by the Board:

26   /////

1. <u>Violence Potential</u>:  Under ordinary circumstances when he is able to cope with life stresses in a constructive, positive manner, [petitioner's] violence potential is judged to be below average for an inmate with a life term.  During the nearly four year period of his escape, [petitioner] remained violence free until his gambling again plunged him into desperate financial circumstances, as it had done previously when he committed the capital crime.  His potential for violence is, therefore, unpredictable if he should again take up gambling.

2. <u>Significance of Alcohol and Drugs</u>:  [Petitioner] described himself as a social drinker, and drug or alcohol use appear unrelated to his antisocial acts.

3. <u>Exploration of the Commitment Offense</u>:  [Petitioner] has gained some intellectual understanding of the factors that led up to the offense, but does not appear to have emotionally worked through and come to terms with the underlying causes.  More in-depth exploration is indicated for a better understanding of the dynamics underlying his propensity to gamble and to act-out antisocially and violently.  Therapy efforts thus far appear to have focused more on symptoms than etiology.  As a result of his treatment at Vacaville, he has learned to channel his anger constructively by jogging, working out, and lifting weights.  He also attempts to "talk out problems" and not "swallow his anger" as he did in childhood.

His treatment with Dr. Walk focused on coping with phobias through progressive relaxation and desensitization training.  As reported by Dr. Walk, [petitioner] has "made strides confronting officials, psychiatrists, and psychologists, without feeling intimidated."  [Petitioner] appears to have sufficiently progressed in therapy that he can now benefit from a more long term insight oriented therapy.

4. <u>Need for Therapy</u>:  [Petitioner] was concerned that he would have to remain incarcerated for a longer period of time if recommendations were made for more therapy.  He needs to be reassured that after sufficient therapeutic progress is made, he can be recommended for parole with the condition to continue therapy on an outpatient basis.  Given the fact that gambling is an addictive behavior and was indirectly related to the capital offense, [petitioner] would certainly benefit from therapy to prevent relapse, particularly since he has not yet had any therapy specifically focused on it.  Therapy should include exploration of all predisposing factors, from excessively harsh parental discipline, exposure to gambling as accepted social behavior, high value placed on material and financial symbols, to lack of family emphasis on saving, planning, and budgeting.  He also needs to

/////

1

> learn to identify high risk situations and viable coping responses
> for himself in order to abstain from gambling.

2

3   (Docket No. 33-5 at 79.)

4          On March 28, 1991, the Category X psychiatric council report acknowledged

5   petitioner's past problems, but described petitioner as a man of "significant intelligence and

6   ability to look at himself objectively with few exceptions."  (Supp. Brief, CDC at 186.)  The

7   Council recommended petitioner receive individual psychotherapy and concluded that petitioner

8   had the

9

> potential ability to resolve problems by using his intelligence, and
> to delay immediate gratification or immediate impulsive behavior

10

> to deal with internal conflicts.  With the caveat of continued
> psychotherapy prior to parole, and the assurance of some support

11

> system for the subject after parole, we feel that he has a relatively
> good prognosis for parole success.

12

13   (Supp. Brief, CDC at 187.)

14          On June 26, 1991, Dr. Walk wrote a letter to the Board confirming that petitioner

15   "does not have any diagnosable personality disorder.  [His] primary Diagnoses have been both

16   (1) Social Phobia and (2) Simple Phobia."  (Docket No. 33-6, at 7; Docket No. 34-5 at 42.)  Dr.

17   Walk stated that with treatment by Systematic Desensitization to the Phobic Stimulus by using

18   combinations of relaxation techniques, breathing exercises and guided imagery, plaintiff was

19   about 75% improved when treatment was unexpectedly terminated.  (Docket No. 34-5 at 43.)  He

20   noted there could be some relapse, without continued treatment, but essentially petitioner was

21   "symptom free and a high functioning person when not in a phobic situation."  (Id.)  Dr. Walk

22   expressed a willingness to continue treating petitioner upon his parole.  (Id. at 44.)

23          On June 20, 1992, a psychological evaluation was performed by Sophia

24   Konstantinou, Ph.D.  (Docket No. 33-5, at 69-70.)  She noted petitioner had "voluntarily sought

25   psychotherapy for symptoms of pervasive anxiety, panic, and what appears to be a social phobia"

26   and the focus of therapy was to "reduce [petitioner's] anxiety through progressive, systematic

18

1   desensitization accompanied by relaxation techniques." (Id. at 69.)  She attributed the sources of

2   petitioner's anxiety to "group settings" and "environments [in which] he feels scrutinized by

3   others."  (Id.)

4           Dr. Konstantinou found petitioner had "programmed increasingly effectively,"

5   and had finished a Category X evaluation program (March 1991), upgraded educationally, and . .

6   . remained disciplinary free since 1983," worked "full-time in the vocational industrial electric

7   trade and attend[ed] Narcotics Anonymous Meetings." (Docket No. 33-5, at 69.)  Petitioner

8   admitted guilt for the life offense, took responsibility for the "behavior and expressed an

9   appropriate level of remorse for the victim as well as the victim's family members."  (Id.)

10  Although initially reserved, petitioner relaxed and spoke candidly.  (Id.)

11          She noted that while Dr. Walk's diagnosis was accurate, it appeared to be

12  "situationally induced and does not interfere with [petitioner's] daily functioning or his cognitive

13  capabilities."  (Id.)

14          [Petitioner] expressed relatively good insight into the factors he
            associates with regard to past behavior.  At the time of the offense,
15          his thinking was marked by "gross irrationality and immaturity."

16          Apparently, his lifestyle was a consequence of "poor judgment and
            rebelliousness."  He "dabbled in playing cards and eventually quit
17          his job, thinking he could turn pro."

18  (Id. at 69-70.)  She found petitioner could be objective and had good insight into his past.  (Id. at

19  70.)  Petitioner had "matured, increased his insight with regard to the offense-related behaviors,

20  and ha[d] ultimately been able to make concrete parole plans with a realistic foundation."  (Id.)

21  His "past psychiatric diagnosis can be directly related to criminal behavior."  (Id.)

22          Dr. Konstantinou diagnosed petitioner with social phobia, in partial remission

23  (Axis I) and personality disorder, NOS, with inadequate features, by history only (Axis II).  (Id.)

24  She concluded as follows:

25          In a less controlled setting, such as return to the community,
            [petitioner] can be expected to maintain present gains.  Violence
26          potential in the past is estimated to have been greater than average

19

1   |   based on his poor judgment, immaturity, and lack of goals at the
2   |   time.  At present, violence potential is estimated to be decreased and average for the general population based on his completion of a salable vocational trade, documented job offers, and the
3   |   emotional support of his family and girlfriends.  Should a parole date be granted, it is recommended that [petitioner] be supervised
4   |   with regard to maintaining full-time employment within the community.  Until then, therapy on an informal, as-needed basis
5   |   would be suggested; however, [petitioner's] focus would be better served if he expends his energy on completing a viable trade.

6

7   (Id.)

8   In August 1993, K. O'Meara, Ph.D. provided a psychological evaluation noting

9   there was "no evidence of a thought, mood, or perceptual disorder."  (Docket No. 33-5 at 65-66.)

10  |   He is of average to above average intelligence although his thinking is somewhat rigid and concrete.  Judgment and impulse
11  |   control appear to be adequate in this environment.  Level of personal insight, on an intellectual level, is average.

12  |
13  |   A long-standing pattern of keeping his emotions at abeyance remains present.  To some extent this may be adaptive for him.
       However, he seems to have difficulty in acknowledging that his
14  |   feelings are difficult for him to process.  On the positive side he appears to have assumed an increasing degree of responsibility for
15  |   his commitment offense.

16  (Docket No. 33-5 at 66.)  Dr. O'Meara diagnosed petitioner with Social Phobia, in partial

17  remission (Axis I) and Personality Disorder, NOS with inadequate and avoidant features,

18  improving (Axis II).  (Id.)  Dr. O'Meara concluded:

19  |   In a less controlled setting such as return to the community, [petitioner] can be expected to maintain present gains provided he
20  |   has psychosocial support and daily structure.  Violence potential in the past is estimated to have been greater than average based on his
21  |   lack of insight, impulsivity, lack of judgment and immaturity.  At present the violence potential is estimated to be decreased and
22  |   considered average for this population.  Should a parole date be granted it is recommended that he participate in 12-Step Program
23  |   focusing on addictive behaviors, and that he participate in ongoing insight oriented psychotherapy.

24

25  (Docket No. 33-5, at 66.)

26  /////

20

1    Samuel G. Benson, M.D., prepared a report in February of 1994, that stated:

2    Carr is a 47 year old, Black, who does not and has not suffered
     severe psychiatric illness such as Schizophrenia, Manic
3    Depression, or Organic Mental Disorder.  My own evaluation and
     recent psychological evaluation from the BPT, 1992 and 1993
4    confirm the above.  He does have a mild form of anxiety disorder
     known as Social Phobia which is in partial remission.  Denies
5    suicidal homicidal or psychotic thoughts.  In addition, he has
     concerns that he meet his BPT goals of psychological therapy.
6    Inmate agrees to see me on regular basis every two to four weeks
     for psychotherapy.  Inmate agrees to consider my recommendation
7    that anti-anxiety medications could help.

8    (Supp. Brief, CDC at 99.)

9         Kathleen O'Meara, Ph.D., performed a psychological evaluation in October 1994,

10   and noted that petitioner had been seeing psychiatrist Dr. Benson since May 17, 1994, working

11   on issues of social phobia and exploring ADD.  (Docket No. 33-5, at 61.)  Dr. O'Meara described

12   petitioner as less guarded and more forthcoming than the previous year, and noted no evidence of

13   a mental or mood disorder.  (Id.)  "He appears to have made some progress in the past year in

14   dealing with feelings he had made a long standing effort to avoid."  (Id.)  Dr. O'Meara diagnosed

15   Personality Disorder, not otherwise specified, with inadequate and avoidant features (Axis II) and

16   concluded:

17   In a less controlled setting such as return to the community
     [petitioner] can be expected to maintain present gains provided that
18   he has available structure and support.  He has been incarcerated
     for most of his adult life and his transition into society would
19   require a period of deinstitutionalization.  His violence potential is
     considered decreased and average for this population.

20

21   (Id.)

22        In December 1995, R. Horon, Ph.D., set forth petitioner's psychiatric history,

23   noting that "it appears there has been some shift over the years, with differences of opinion and

24   significant confusion at times."  (Docket No. 33-5 at 56.)  Dr. Horon found petitioner's March

25   1991 CAT "X" report to be the most in-depth.  Petitioner

26   /////

> is overly responsive to the opinions of others. . . is easily drawn
> into being argumentative and litigious. . .in this mode he can be
> fiercely stubborn and rigid, judgmental and critical of others.  As
> part of this paranoid disposition, he can be extremely wary of
> losing control. . . or being open in such a way as to be taken
> advantage of.

(Docket No. 33-5 at 56, quoting Dr. Bruce from 1991 CAT "X" report.)  Petitioner was noted as

having a "guardedness and hyper-alertness" and "displaces aggressive impulses 'by litigious

means.'"  (Docket No. 33-5 at 56, quoting Dr. Ishida from 1991 CAT "X" report.)

       Dr. Horon noted petitioner was "quite guarded and tense, and there was an

episode of tearfulness (similar to what have been noted in previous evaluations). . .His

intellectual abilities were estimated to be in the average to above average range." (Docket No.

33-5 at 57.)  During the interview, petitioner explained he was young, immature and irrational at

the time of his life crime and his actions led to the tragic death of another man.  (Id.)  Petitioner

stated he had gained insight from VORG and AA as to the tragic consequences involved in those

types of behaviors.  (Id.)  Petitioner stated he had improved his social phobia, noting that a few

years prior he would have found ways to leave the interview whereas now he is able to stay and

complete the interview.  (Id. at 58.)  Petitioner concluded by stating:

> I feel that it's important for those concerned to understand that part
> of the maturation process is to both to appreciate past wrong
> doings and to learn about the insight and come to grips with
> appreciating the tragic misfortune that befell the victim and how it
> impacted the public in general and also come to realize over the
> years there's a lot of pain associated with one's criminal misdoings
> which have far reaching consequences for both the victim and
> myself.  One pays a hell of a price for youthful indiscretions, for
> instance, I would have had the opportunity to participate in my
> parent's wedding anniversary, September 12.  They were
> celebrating their 50th wedding anniversary, it was a painful
> experience for me to still be here, everyone gathered around for the
> reunion.

(Id.)  Dr. Horon diagnosed petitioner with Delusional Disorder, Persecutory Type (Axis I), no

diagnosis on Axis II or III, problems related to interaction with the legal system/crime (Axis IV).

(Id.)  Dr. Horon explained that the delusional disorder

is marked by non-bizarre delusions related to a prevalent theme . . . [involving] "the person's belief that he or she is being conspired upon. . . maliciously maligned, harassed, or obstructed in the pursuit of a long-term goal.  Small slights may be exaggerated and become the focus of a delusional system.  The focus of the delusion is often on some injustice that must be remedies by legal action ('querulous paranoia') and the affected person may engage in repeated attempts to obtain satisfaction by appeal to the courts and other government agencies."

(Id. at 58-59, quoting DSM-IV, pp. 298)[7]  However, Dr. Horon noted that he is "generally functioning reasonably well in social and work situations (the presence of a delusional disorder does not require significant impairments in daily functioning)." (Id. at 59.)  Dr. Horon concluded that petitioner had a "clear case of a Delusional Disorder, Persecutory Type.  This diagnosis is very difficult to make, and can cause a great deal of diagnostic confusion–largely due to the fact that the delusions themselves are not bizarre in nature, and functioning in most areas is usually intact." (Id. at 59-60.)

However, Dr. Horon found petitioner's "potential for violence is considered below average when compared with other inmates at this time based purely upon his disciplinary history." (Id. at 60.)  Petitioner's "aggression is displaced through litigation, which has helped his overall adjustment.  His potential for violence outside incarceration can be reduced with careful parole planning." (Id.)  Dr. Horon suggested petitioner avail himself of psychiatric counseling because "[c]hanging symptoms of depression, anxiety, and phobias are often

---

[7]  Dr. Horon documented this diagnosis by reviewing legal materials contained in petitioner's central file.  One example cited was petitioner's lawsuit over a disciplinary action taken when, in 1986, petitioner attempted to order a handbook on locks and security from a prison library despite the institution librarian's permission to do so. (Id.)  The order was cancelled and petitioner was disciplined because of his escape history. (Id.)  Petitioner argued that the disciplinary was a mistake of the librarian's and caused him psychological and emotional damage; petitioner maintained he suffered a complete mistrust of staff at Folsom Prison and that the disciplinary action would haunt his annual parole consideration hearings. (Id.)  Dr. Horon opined that this lawsuit documented the delusional disorder in three ways: (1) the interpretation of the disciplinary as an intentional injustice or harassment which could only be remedied through legal means; (2) the statement of mistrust related to this incident meant petitioner felt conspired upon or maliciously maligned; and (3) the lawsuit expresses petitioner's resentment of being harassed as evidenced by his request for $300,000.00 in damages. (Id.)

1   associated with this disorder and often confuse diagnosis, as in this case."  (<u>Id.</u>)  "[I]ndividuals

2   with this diagnosis can be successful [on parole] if their disorder is recognized, if psychosocial

3   supports are available (i.e. financial and other agency supports), and if the individual is able to

4   maintain an open-ended (as opposed to time-limited) relationship with a mental health clinician,

5   even if visits are infrequent."  (<u>Id.</u>)

6           Following the 1995 report, petitioner sought a supplemental consultation and Dr.

7   Horon issued an addendum clarifying some of the points contained therein.  (Docket No. 33-5 at

8   53-54.)  Petitioner "stated that his diagnosis did not take into account his work as a law library

9   clerk and as a 'jailhouse lawyer.'"  (<u>Id.</u> at 53.)  Petitioner argued that if someone in the

10  community had been subjected to incidents such as the one reviewed in the 1995 report, litigation

11  would be involved there as well.  (<u>Id.</u>)  Petitioner also stated that his review and study of law

12  books helped him cope and he had been "instrumental in training other law clerks within the

13  CDC."  (<u>Id.</u> at 54.)

14          Dr. Horon clarified that petitioner appeared

15          to feel that a diagnosis of a psychiatric condition de-values his
            humanity or his worth as a jailhouse lawyer.  This is not the case
16          per se.  The psychic defense of turning unacceptable impulses into
            pro-social behaviors (sublimation), in this case paranoid or
17          aggressive impulses, is a positive response which is both valuable
            and quite human.  The diagnosis of a psychiatric condition does not
18          represent a de-valuing of the evaluee, rather it represents a
            description of behavioral and/or intrapsychic phenomena.

19

20  (<u>Id.</u>)

21          In the March 1997 psychological evaluation prepared by Kathleen O'Meara,

22  Ph.D., petitioner's mental status was described as overall friendly.  (Docket No. 33-5 at 51.)  She

23  noted he "appears reluctant to fully explore the crime he committed," which she thought related

24  "to his long standing pattern of avoiding strong and painful feelings."  (<u>Id.</u>)  "[H]is key

25  psychological defense mechanisms revolve around denial, externalization, and projection.  His

26  thinking is characterized by inflexibility and rigidity."  (<u>Id.</u>)

1

2
  His understanding of his gambling addiction, although improved,
  remains somewhat superficial and cloaked in defensiveness.  When
  asked if he considered himself a compulsive gambler (his history
  indicates this is the case,) he replied, "Why haven't I been thrown

3
  in the hole if I'm a pathological gambler?"  He seemed to
  adamantly believe that the absence of the behavior indicated that

4
  the problem had been eradicated.

5
(Id. at 51-52.)  Her final diagnosis was Axis I, Pathological Gambling, in remission, and Axis II,

6
antisocial personality disorder, improving.  (Id. at 52.)

7
  Dr. O'Meara concluded that petitioner's

8
  reluctance to thoroughly address the instant offense bodes for a
  guarded prognosis with respect to violence potential.  The instant

9
  offense was very violent and [petitioner] continues to have
  difficulty accepting and integrating hostile affects.  To his credit, in

10
  a controlled environment, he has exhibited no aggressive
  behaviors.  Also, he appears to be maturing and there have been no

11
  indications of impulsivity.

12
  If he is to be paroled and released, it is recommended that he
  remain in ongoing treatment for compulsive behavior (gambling)

13
  and that he seek assistance through the parole out-patient clinic.

14
(Id.)

15
  On November 25, 1997, Michael Vasquez, Ph.D., performed a mental status

16
examination on petitioner and found he had "little or no violent tendencies and has a highly

17
effective intellectual capacity that is not being utilized to its fullest.  Whatever antisocial

18
personality traits he had 30 years ago have been lessened significantly throughout his years of

19
incarceration."  (Docket No. 33-5 at 48.)

20
  Dean J. Clair, Ph.D., on November 20, 1998, issued a psychosocial evaluation

21
stating that "the only indication of a mental health problem was a diagnosis of "Delusional

22
Disorder" made at a 1995 evaluation."  (Docket No. 33-5 at 47.)  Dr. Clair found no evidence of

23
any other major mental disorder.  Petitioner admitted having a "social phobia" or "tendency to

24
freeze psychologically when he finds himself in certain types of group settings."  (Id.)

25
Petitioner's feelings of depression were successfully treated by supportive therapy with mental

26
health staff.  (Id.)  Dr. Clair concluded that he had little to add to his 1997 conclusions; petitioner

"is above average in intelligence.  He has grown well beyond the predatory and antisocial behavior he exhibited thirty years ago.  If paroled, [Dr. Clair believes] he would pose a negligible threat to the public order."  (Id.; Docket No. 37-6 at 24.)

In his March 16, 2000 psychosocial evaluation, Dr. Clair noted that petitioner had "not been charged with a single act of violence in the course of his entire incarceration." (Docket No. 33-5 at 45.)  Although violence potential was a problem for petitioner in his early twenties, petitioner

> has now matured past that condition and he is now motivated
> purely [by] a need to do whatever he must do to regain his
> freedom.  The writer continues to feel that he is no longer
> 'dangerous.'  ¶  . . . There are no psychological findings that would
> reduce this man's suitability for parole.

(Docket No. 33-5 at 45.)

Dean J. Clair, Ph.D. issued a psychosocial evaluation for petitioner on December 5, 2000.  Dr. Clair noted that early in his incarceration, petitioner was found to have differing personality disorders, all relating to various forms of sociopathy.  (Docket No. 33-5 at 41.)  In his forties, petitioner "became increasingly involved in various therapy programs, one of which was 'relaxation therapy.'"  (Id.)  Staff was satisfied with his progress and participation.  (Id.)  In 1995, petitioner developed a "delusional disorder" where he was periodically litigious.  (Id.)  Then, petitioner struggled with a "'social phobia' where one manifestation was an inability to perform either major excretory function in the presence of other people."  (Id.)  "Most recently, he became reactively depressed.  Again, none of these conditions interfered with his work schedule or incapacitated him in any way."  (Id.)

As noted above, Dr. Clair noted that petitioner has "progressed remarkably," compiling a "record of conformity, stability, and productivity. . . .He is mentally stable and has never been significantly addictive.  As before, the writer feels that this man is no longer 'dangerous.'"  (Docket No. 33-5 at 42.)

/////

1    On February 25, 2003, John T. Rouse, Ph.D. provided a psychosocial assessment

2 evaluation for the Board of Prison Terms.  (Docket No. 33-5 at 35-38.)  Dr. Rouse assigned no

3 diagnosis on Axis I, and found petitioner had a personality disorder not otherwise specified (with

4 antisocial features resolved) on Axis II.  Dr. Rouse reviewed petitioner's life crime and noted:

5             Whatever antipersonality traits he has had prior to his incarceration
            has lessened significantly and he seems to have made significant
6             gains in understanding his life crime as well as his life prior to his
            incarceration.  He has, as reported by other examiners, compiled a
7             record of conformity, stability, and productivity and as such, Mr.
            Carr no longer presents as a danger to the community.  His risk of
8             dangerousness at this point is negligible and less than that of the
            average inmate incarcerated here at CSP-Solano.

9

10 (Id. at 37.)  Dr. Rouse concluded that petitioner

11             has no current diagnosed psychopathology which would be related
            to his life crime.  He has never been diagnosed as having a severe
12             mental disorder.  Thus, any parole consideration the Board would
            ponder for Mr. Carr would be related to factors other than mental
13             health issues.

14 (Id. at 38.)

15    Petitioner's classification score dropped to zero in May of 1995.  (Docket No. 33-

16 5 at 41; Docket No. 38-8 at 25.)

17    Most of the Governor's findings were based on static factors that petitioner is

18 powerless to change:   petitioner's underlying crime and his criminal history.  Most of these

19 factors took place prior to 1969, over thirty years ago.  While petitioner's crime was, indeed,

20 heinous and his early years of incarceration and escape are of concern, petitioner's last act of

21 violence occurred in the 1977 robbery.  Petitioner has not sustained a serious rules violation since

22 1983.

23    The 2003 decision to deny petitioner parole was the eighteenth denial of parole

24 premised almost entirely on petitioner's commitment offense and criminal history.  Without

25 additional factors demonstrating petitioner presents a current danger to society, the continued

26 /////

27

1  denial of parole violates petitioner's right to due process.  The court will address the Governor's

2  reasons seriatim.

3              a.  History of Institutional Behavior

4              There is no question that petitioner's early institutional behavior was problematic.

5  However, it was error for the Governor to find petitioner failed to acknowledge his prior

6  misconduct when petitioner told the 2003 Board that he had "taken to the Board 20 years of clean

7  time, disciplinary free."  It was unfair of the Governor to discount petitioner's twenty years of

8  good conduct based on events in 1977, 1978 and 1983.  Petitioner's prior misconduct does not

9  preclude petitioner from taking credit for being disciplinary-free for the subsequent twenty-year

10  period.

11              It was also error for the Governor to rely on reports of minor misconduct.  The

12  regulations specifically refer to "serious" misconduct, for example, serious rule violations or

13  115s, as a basis for finding an inmate unsuitable for parole.  15 C.C.R. § 2402(c)(6).

14              In addition, the Governor took petitioner's statement out of context.  (Supp. Brief,

15  at 32.)  Petitioner asked the Board to consider the Governor's recent grant of parole to Richard

16  Kemp who had 19 years of clean time, and note by comparison petitioner's 20 years of clean

17  time.  (Pet., Ex. J at 45; see also Supp. Brief, Ex. 3.)  Petitioner stated:  "I close by saying that

18  taking . . . notice of Mr Davis granting parole, he noted that Kemp's record is second to none.  I

19  ask the Board to consider my record third to none."  (Pet., Ex. J at 45.)  Mr. Kemp beat a

20  longtime friend to death during an argument over drug money in 1982; Governor Davis approved

21  his parole in 2003.  (Supp. Brief, Ex. 3.)  Governor Davis described Mr. Kemp's crime as

22  "shockingly brutal."  (Id.)

23              Petitioner's legitimate claim to twenty years of good time does not provide some

24  evidence to support the Governor's decision.  Rather, petitioner's twenty years of good conduct

25  supports his release on parole and demonstrates he no longer poses a risk of danger to society.

26  /////

b.  Gambling

Gambling was indirectly related to petitioner's life offense.  After receiving an "other than honorable" discharge from the military, petitioner began work at Georgia Pacific where he worked as a tail sawyer in a sawmill on the 1400 - 2200 shift.  (Docket No. 33-5, at 79.)  He started hanging out at the union hall before work and gambling, playing pinochle or poker.  (Id.)  This resulted in bad consequences; he was broke most of the time.  He stopped making payments on gifts to his parents and they were repossessed.  He became estranged from his family.  His brother refused to let him spend the night.  He started living off his parents until he refused to give them $40.00 which they needed; they asked him to return the house key and leave.  At that point, he moved in with a maternal uncle and continued to gamble.  (Docket No. 33-5, at 79.)

Petitioner took up with an ex-convict from San Quentin who was burglarizing homes with his girlfriend.  (Id. at 80.)  They saw an old man gambling a large sum of money, followed him home, then returned the following night to rob him.  Petitioner left with $740.00.  (Id.)

On August 27, 1973, petitioner escaped from prison for four years.  (Docket No. 38-4 at 50.)  Four years after he escaped, he committed a robbery by hitting another elderly man over the head while the victim was opening a business safe.  (Docket No. 23, Ex. 3 at 13.)  Petitioner stole $3,000.00 to $4,000.00 while armed with a gun.  (Id.)  Petitioner revealed the motive for the 1977 robbery was to obtain money to offset gambling losses.  (Id. at 15.)  Petitioner was "heavily involved in gambling as a sole means of support at the time both robberies were committed."  (Id. at 15.)

In 1983, petitioner revealed that the 1969 murder was the result of his addiction to gambling.  (Docket No. 23, Ex. 3 at 15.)  In 1979, he revealed the motive for the 1977 robbery was to gain money to offset gambling losses.  (Id. at 15.)  In 1997, he admitted having an addiction to gambling.  (Pet., Ex. J, at 2-3.)

1    In 1983, petitioner received a California Department of Corrections disciplinary

2  (115) which was later reduced to a 128 for possession of $160 that he admits was gained from

3  "running a three for two loan sharking operation."  (1987 Board Report at 3; Docket No. 38-4 at

4  50.)

5    In the Board's review of the 17th subsequent parole hearing decision, the review

6  unit found that

> The hearing panel failed to discuss with the prisoner his gambling
> addiction.  During the psychological evaluation dated March 1997,
> the prisoner admitted his addiction to gambling.  Also, in his
> Category X evaluation, the prisoner's gambling addiction was seen
> as an underlying cause of the offense.  Due to the possible
> consequences of a return to gambling by the prisoner if released on
> parole, this issue needs more discussion.

11  (Docket No. 35-4, at 52.)

12    Rather than acknowledging that admitting the gambling addiction was a major

13  step toward addressing the addiction, the Governor found petitioner's gambling addiction had not

14  been addressed.  The Governor's decision focused on petitioner's admission in 1997 but failed to

15  note that in the March 1997 Psychological Evaluation, petitioner explained that he used the

16  addiction treatment program in NA for its relevance to his gambling addiction.  (Pet., Ex. J at 1.)

17  The Governor failed to recognize petitioner's consistent attendance at NA as well as his

18  voluntary participation in psychotherapy since 1997.  A review of the entire record, in context,

19  demonstrates that petitioner has participated in ongoing NA sessions and mental health therapy.

20  The fact that he finally admitted his addiction and expressed the knowledge that he must forever

21  refrain from gambling (Docket No. 33-5, at 51), also demonstrates great strides in recovering

22  from the addiction.

23    Indeed, there is no evidence in the record that petitioner has continued to gamble

24  while in prison after 1983, or that he has denied a need to refrain from gambling or attend

25  Narcotics Anonymous or seek mental health counseling; rather, the record demonstrates a long

26  and continued history of attendance and participation in NA since at least 1990.  The prison has

1   no program specifically tailored to gambling, yet petitioner "uses the addiction treatment

2   program for its relevance to his gambling addiction." (Docket No. 33-5 at 49.)  In Dr. O'Meara's

3   March 1997 psychological evaluation, petitioner stated at the time of his life crime he was

4   addicted to gambling, but he isn't now.  (Id. at 51.)  "I no longer gamble at all, during that time I

5   had a gambling problem that was 25 years ago, and when I was on escape when I thought I could

6   win money after losing my job."  (Id.)  He still attended NA on a weekly basis.  (Docket No. 33-5

7   at 50.)

8              While the record is clear that there was a strong causal connection between

9   petitioner's gambling problem and his violent commitment offense, his gambling addiction does

10  not by itself reasonably establish current unsuitability because there is no additional evidence to

11  complete a chain of reasoning between his gambling and a finding that because of it he currently

12  poses an unreasonable risk of danger if released.  In other words, in the absence of some evidence

13  to support a reasonable belief that petitioner might start gambling again, the fact that he gambled

14  25 years ago does not by itself represent some evidence that he is currently dangerous.

15             Moreover, here the record does not contain any evidence to support reasonable

16  grounds to believe petitioner might start gambling if released.  There is no evidence that

17  petitioner's former desire for gambling might still be present or that he refused, failed, or did

18  poorly in NA; rather the record demonstrates an active participation therein.  Based on

19  petitioner's admission that he had a gambling addiction, the Board can require petitioner to

20  attend Gamblers' Anonymous meetings as a condition of his parole.  Indeed, at least three

21  psychologists have noted that certain conditions can be placed on petitioner's parole to address

22  this concern.  For example, on March 11, 1991, Dr. Bruce suggested petitioner should continue

23  his psychiatric treatment on parole as petitioner's violence potential increases if he takes up

24  gambling again.  (Docket No. 33-5, at 79.)  In 1992, Dr. Konstantinou recommended petitioner

25  be supervised regarding full-time employment and receive therapy on an as-needed basis.

26  (Docket No. 33-5, at 70.)  Dr. O'Meara suggested in 1993 that petitioner could be required to

1   participate in a 12 step program to focus on his addictive behaviors.  (Docket No. 33-5, at 66.)  In

2   1997, she recommended that petitioner remain in ongoing treatment for compulsive behavior

3   (gambling) and that he seek assistance through the parole out-patient clinic.  (Docket No. 33-5 at

4   52.)

5           "[A]lthough the state expects prisoners to behave well in prison, the absence of

6   serious misconduct in prison and participation in institutional activities that indicate an enhanced

7   ability to function within the law upon release are factors that must be considered on an

8   individual basis by the Governor in determining parole suitability."  In re Rosenkrantz, 29

9   Cal.4th 616, 682, 128 Cal.Rptr.2d 104 (Cal. 2002).  A review of petitioner's mental health

10  records and progress through therapy demonstrate petitioner has been improving over time.

11          The fact that gambling was involved in petitioner's commitment offense 39 years

12  ago or his 115 sustained in 1983 does not constitute some evidence that petitioner might start

13  gambling and become violent again, and therefore that he currently poses an unreasonable risk of

14  danger without further treatment.  Indeed, if petitioner's past gambling established this

15  unsuitability, the Board could deny parole for the rest of petitioner's life based on this

16  unchanging factor, without regard to subsequent evidence that petitioner has no current desire for

17  gambling and that there is little current likelihood of gambling relapse, let alone a return to

18  violent conduct as a result of it.

19          The Governor's broad statement that petitioner's serious gambling addiction had

20  not been addressed is belied by the record, ignores petitioner's participation in Narcotics

21  Anonymous consistently and actively since 1990, (Supp. Brief, CDC at 36-37, 68-69, 92- 96,

22  100, 111, 115; C-File at 555-56, 559-60, 562, 570-71, 603, 607, 609 & 612), and demonstrates

23  he failed to appropriately acknowledge petitioner's long and faithful commitment to the NA

24  program or to his decision to forever refrain from gambling.  Thus, the Governor's finding that

25  petitioner's gambling addiction has not been addressed is not supported by some evidence.

26  /////

c.  Childhood Abuse

The Governor refused to credit recent psychological evaluations because they failed to address the issue of childhood abuse petitioner allegedly sustained.

Petitioner describes his youth as follows:

> [Petitioner] was born in Missouri on July 3, 1946, to Charles Henry Carr, a sawmill worker, and Margaret Patterson Carr.  [Petitioner] was the oldest of eight children.  When [petitioner] was 11 years old, the family moved from Missouri to California.  When [petitioner] was 14 years old his parents "became very religious and puritanical in their views."  They forbade their children from reading magazines, going to movies, and dating. . . .  [Petitioner] has no juvenile record.  At numerous times during his incarceration [petitioner] has acknowledged that his parents were strict disciplinarians who sometimes used corporal punishment which today would be considered abusive.

(Supp. Brief at 4 [internal citations omitted]; see, for example, 1997 Psychological Evaluation, Pet., Ex. J.)

As petitioner points out, however, it would be difficult to quantify whether the use of "excessively harsh parental discipline" and corporal punishment (use of a switch) constituted child abuse when viewed through the perspective held in the 1940s through 1960s.  (Supp. Brief at 35.)  Many parents adhered to a "spare the rod and spoil the child" perspective, particularly in religious households.  It was unreasonable for the Governor to latch on to prior psychologists' mention of childhood abuse without crediting petitioner for his years of therapy and self-help through his participation in VORG, NA and the Mens Violence Program.  Indeed, the Governor noted that petitioner had "made progress in overcoming his reluctance to address psychological issues."  (Id. at 15.)  The mere fact that the 2003 report did not mention childhood abuse does not support the Governor's finding that petitioner is not suitable for parole because of it.  Most of the psychologists have found that petitioner does not pose a danger to society if released based on his maturation and progress achieved through therapy while incarcerated.

/////

/////

33

1           d.  1998 and 1999 Life Prisoner Evaluation Reports

2           The Governor also noted that recent reports failed to address the 1998 and 1999

3   Life Prisoner Evaluation Reports that concluded petitioner posed an unpredictable degree of

4   threat to the public.  A review of all the life prisoner evaluation reports reflects the use of a

5   boilerplate format, with no provision to analyze or explain a change in recommendation from one

6   year to the next.  The regulations do not require the Board to comb through every record in an

7   inmate's history and address all prior findings by the correctional counselors in their life prisoner

8   evaluation reports.  Indeed, such a process would be extremely time-consuming.

9           Despite the fact that the 2002 Board expressed concern that petitioner "never

10  seemed to really get to [his] innermost feelings," psychologists found petitioner has made

11  progress through therapy.  Dr. Bruce in the Category-X performed in 1991 noted that petitioner

12  had made strides and progressed in therapy.  Docket No. 33-5 at 79.)  Dr. Konstantinov in 1992

13  found petitioner had matured.  (Docket No. 33-5 at 69-70.)

14          Indeed, Dr. O'Meara, in 1993, articulated the progress petitioner had made:

15          Violence potential in the past is estimated to have been greater than
            average based on his lack of insight, impulsivity, lack of judgment
16          and immaturity.  At present the violence potential is estimated to
            be decreased and considered average for this population.
17

18  (Docket No. 33-5 at 66.)  In March of 1997, she opined:

19          reluctance to thoroughly address the instant offense bodes for a
            guarded prognosis with respect to violence potential.  The instant
20          offense was very violent and [petitioner] continues to have
            difficulty accepting and integrating hostile affects.  To his credit, in
21          a controlled environment, he has exhibited no aggressive
            behaviors.  Also, he appears to be maturing and there have been no
22          indications of impulsivity.

23  (Docket No. 33-5 at 51.)  However, in November of 1997, Dr. Vasquez found petitioner had

24  "little or no violent tendencies and has a highly effective intellectual capacity that is not being

25  utilized to its fullest.  Whatever antisocial personality traits he had 30 years ago have been

26  lessened significantly throughout his years of incarceration."  (Docket No. 33-5 at 48.)  By

34

1    November 20, 1998, Dr. Clair found petitioner "has grown well beyond the predatory and

2    antisocial behavior he exhibited thirty years ago.  If paroled, [Dr. Clair believes] he would pose a

3    negligible threat to the public order."  (Docket No. 33-5 at 47; Docket No. 37-6 at 24.)

4            On December 5, 2000, Dr. Clair concluded petitioner had "progressed

5    remarkably," compiling a "record of conformity, stability, and productivity. . . .He is mentally

6    stable and has never been significantly addictive.  As before, the writer feels that this man is no

7    longer 'dangerous.'"  (Docket No. 33-5 at 42.)

8            These psychological records more than adequately demonstrate how the

9    correctional counselors could have found, in 2000 and beyond, petitioner now posed only a

10   minimal threat rather than an unpredictable threat.  Indeed, a review of the record demonstrates

11   that a better question is why the correctional officers in 1998 and 1999 found petitioner to be an

12   unpredictable threat when psychologists found petitioner was not a threat, and in view of the lack

13   of any violent disciplinaries during his incarceration and that his last act of violence occurred in

14   1977.

15            e.  Past & Present Attitude Toward Crime

16            The Governor noted that petitioner has expressed remorse for killing the victim

17   since 1997, but found petitioner still posed an unreasonable risk of danger to society because of

18   his prior varying statements concerning the murder.  In addition, the Governor found the most

19   recent psychiatric report was flawed because it erroneously stated petitioner had always admitted

20   responsibility for his crime.  Also, he found recent psychosocial evaluations failed to reflect any

21   change or progress on petitioner's "key psychological defense mechanisms revolv[ing] around

22   denial, externalization, and projection . . . [or] inflexibility and rigidity."  (Ex. 3 to Answer at

23   16.)

24            It was unreasonable for the Governor to find the recent psychiatric report flawed

25   because it stated petitioner had always taken responsibility for the crime, particularly because

26   petitioner confessed to the crime shortly after it was committed.  People v. Carr, 8 Cal.3d 287,

35

104 Cal.Rptr. 705 (1972).  "In the taped confession, [petitioner] said that he had asked to use the decedent's telephone.  Upon entering the house he waited for the opportunity and hit the decedent over the head.  [Petitioner] stated that he only wanted to hit the decedent hard enough for the decedent to lose his memory of [petitioner's] presence."  Id., 8 Cal.3d at 293.  The record also reflects that over the years petitioner has expressed remorse for his actions and the victim's death.  (CDC at 44, 59, 65, 122, 157, 166, 184.)

Moreover, as noted above, psychologists have found petitioner has matured, progressed through therapy, and no longer poses a danger to society.  Those findings post-date Dr. O'Meara's 1997 finding concerning petitioner's inflexibility and rigidity.  Indeed, on February 25, 2003, Dr. Rouse found that petitioner "made significant gains in understanding his life crime as well as his life prior to his incarceration."  (Docket No. 33-5 at 37.)  Dr. Rouse concluded petitioner's "risk of dangerousness at this point is negligible and less than that of the average inmate incarcerated here at CSP, Solano."  (Id.)

f.  Inadequate Parole Plans

Finally, the Governor found petitioner posed an unreasonable risk of danger to society because petitioner's parole plans were inadequate; without solid employment plans, and with his gambling addiction issues not addressed, petitioner could become financially desperate and return to criminal activity to support himself.

However, as noted above, the record fails to support the Governor's finding that petitioner's gambling problem has not been addressed.  In addition, the Governor's finding fails to credit the assistance offered by petitioner's siblings, in writing, to provide petitioner a place to live as well as financial support. The Governor also failed to credit petitioner with the myriad skills he has developed while in prison – he has obtained a certificate as an electrician, held many different institutional job assignments, and received excellent work reviews relative to his performance as a clerk.

/////

36

1        The United States Court of Appeals for the Ninth Circuit has held that after an

2   inmate has "served the minimum number of years required by his sentence," Irons, 505 F.3d at

3   853, extended reliance solely "an unchanging factor, the circumstance of the offense and conduct

4   prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and

5   could result in a due process violation." Biggs, 334 F.3d at 917.[8]  California state courts have

6   made similar observations:

> [T]he commitment offense, this court has observed, is an
> unsuitability factor that is immutable and whose predictive value
> 'may be very questionable after a long period of time [citation].'
> [Citation.]  We have also noted, as has our Supreme Court, strong
> legal and scientific support that 'predictions of future
> dangerousness are exceedingly unreliable,' even where the passage
> of time is not a factor and the assessment is made by an expert.
> [Citation.]  Reliance on an immutable factor, without regard to or
> consideration of subsequent circumstances, may be unfair, run
> contrary to the rehabilitative goals espoused by the prison system,
> and result in a due process violation. [Citation.]

13  In re Elkins, 144 Cal.App.4th 475, 498-499 (2006).  Here, petitioner has served 23 years beyond

14  his minimum eligible parole date.  (Pet., Ex. A, at 52-53.)

15        After thorough review of the record, this court finds that the Governor's reversal

16  of the Board's grant of parole was so devoid of evidence that his findings were without support

17  or otherwise arbitrary.  See Hill, 472 U.S. at 457.  Aside from the unchanging facts of the crime

18  itself, the Governor relied on the unchanging facts of petitioner's childhood and 11 year criminal

19  history (1966-77).  While it is true that petitioner's life offense and subsequent robbery were

20  connected to his gambling addiction, the Governor ignored petitioner's 13 year attendance at

21  Narcotics Anonymous, a 12 step program designed to address narcotics addiction, and for

22  petitioner, who doesn't have a narcotics addiction, the only program available to address

23  addiction as there are no programs specifically addressing gambling addictions in prison.  In

24  addition, the Governor ignored petitioner's history of voluntary attendance at psychotherapy.

25  _____

26        [8]  The parole decision at bar was made almost thirty-four years after petitioner's twenty-
    five years to life sentence commenced.

1          While the Governor apparently spent much time combing through prior records in

2    petitioner's file and used those records to discount present psychological reports fully supporting

3    petitioner's release on parole and finding him a low threat of danger to society, the Governor

4    failed to acknowledge that petitioner has had no prison disciplinaries for gambling in prison since

5    1983 and has had no criminal offenses based on gambling since the robbery back in 1977.

6    Indeed, the Governor pointed to no evidence in the record supporting his position that further

7    therapy was required to address said addiction, but rather speculated that the fact that certain

8    recent reports failed to address the gambling addiction meant that petitioner's gambling addiction

9    was unresolved or untreated.  On the contrary, the record reflects petitioner has acknowledged his

10   gambling problem and has been an active participant in Narcotics Anonymous since 1990.  The

11   tools he has acquired through NA also translate to dealing with a gambling addiction.  More

12   importantly, however, there is no record of petitioner having engaged in gambling in prison or

13   having any prison disciplinaries for gambling-related activities since 1983, over 25 years ago.  In

14   light of petitioner's subsequent prison record there is nothing to substantiate the Governor's

15   reversal on this issue save for the unchanging fact that his commitment offense, which occurred

16   in 1969, and subsequent theft, which occurred in 1977, were related to petitioner's gambling

17   problem.  There is nothing in the record that demonstrates gambling continues to be a problem

18   for petitioner over 25 years later.

19          The Governor unfairly attacked petitioner's claim of twenty years without

20   incurring a prison disciplinary, taking it out of context and trivializing petitioner's

21   accomplishment by rehashing petitioner's unchanging criminal history – it is rare and remarkable

22   for an inmate to survive in prison without a serious prison disciplinary for a period of twenty

23   years.  The Governor's concern that petitioner did not have definite plans for parole is also not

24   supported by the record.  Petitioner's sister wrote a letter offering financial support and his

25   brother wrote a letter offering to allow petitioner to live with him.  In addition, it appears

26   petitioner has been saving money to assist himself should he be paroled.  (C-File 225 "$5800 in

1  mutual stock savings.")  Petitioner's long history of excellent work habits in prison demonstrates

2  his work ethic and ability to perform a number of jobs should be he paroled.

3          In light of the above, this court finds that the petition in 2:05-cv-1870 MCE JFM

4  should be granted.

5  II.  Petitioner's Other Cases

6          A.  Case No. 2:05-cv-1871 MCE JFM

7          In this petition, petitioner challenges the 2004 denial of parole by the Board,

8  which was based primarily on three factors:  the commitment offense, the finding that petitioner

9  lacked insight into the brutality of his underlying commitment offense, and Dr. Rouse's

10 psychiatric evaluation was inconclusive because it did not address the issue of gambling.

11 (Docket No. 20 at 91.)  This denial of parole was the nineteenth denial of parole.

12         The Board placed great weight on the fact that the commitment offense was

13 "really brutal" and caused multiple skull fractures.  (Id. at 92.)  The Board found that the fact that

14 petitioner escaped from prison and then "did the very same type of assault on another little old

15 man, . . . show[ed] a real lack of insight into the kind of injury" (id.) petitioner could perform.

16 The Board also emphasized petitioner's two escapes from custody.

17         However, this Board found petitioner had "good parole plans."  (Id.)

18         The last reasoned opinion issued in this action was the Butte County Superior

19 Court's denial, dated November 17, 2004, which stated:

20         The first argument is that the Board's decision to deny parole is not
           supported by 'some evidence".
21
           The record refutes this contention.  There is more than a modicum
22         of factual support for the Board's decision.  Further there is no
           legal prohibition to prevent the Board from considering petitioner's
23         entire history and prison file.

24         The second argument is that the Board is required to submit its
           decision denying parole to the Governor for review within 30 days
25         following the hearing.

26 /////

39

> Review by the Governor is discretionary.  The law does not require
> the Board to provide the Governor with any decision.  It may do so.
> Likewise, the petitioner may do so, or the Governor may initiate
> the review.  Thus there was no violation of law by the Board.
>
> The third argument is that Commissioner Fisher was biased and
> that her decision was an abuse of discretion.
>
> The Commissioner's past history was, among other things[,] that of
> a victim's advocate.  This is not a disqualification for appointment
> to the Board.  Her statement of decision set forth reference to the
> petitioner's response to Governor Davis' parole grant reversal.
> This was a legitimate topic especially since it was the petitioner
> who made it to the central issue of his testimony at the parole
> hearing.
>
> The Petition on its face fails to establish a prima facie case for
> relief on Habeas Corpus.  The Petition is denied.

(Docket No. 20-5 at 2-3.)  This denial is even more conclusory than the state court's denial in

2:05-cv-1870 MCE JFM, and does not attempt to demonstrate petitioner presents a current

danger to the community, as required by <u>Lawrence</u>, 44 Cal.4th at 1205-06; 1210.

This court cannot argue with the Board's evaluation of the brutality of the

underlying commitment offense, which appears to be the primary ground upon which it denied

parole.  However, as explained in <u>Lawrence</u>, 44 Cal.4th at 1214, 82 Cal.Rptr.3d 169, "the

aggravated nature of the crime does not in and of itself provide some evidence of current

dangerousness to the public unless the record also establishes that something in the prisoner's

pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that

the implications regarding the prisoner's dangerousness that derive from his or her commission

of the commitment offense remain probative to the statutory determination of a continuing threat

to public safety."  <u>Id.</u>

As discussed above, there is no relationship between petitioner's commitment

offense, which took place almost 40 years ago, and an assessment of his current dangerousness.

His last episode of violent behavior was in 1977, almost 32 years ago, which also bears no

relationship to his present dangerousness.  Reliance on petitioner's escape from prison back in

1   1973 is similarly stale and offers no prediction that he poses a risk of present danger to society.

2   This lack of relationship is demonstrated by his disciplinary-free and productive 25 years of

3   stability while in prison since his last prison disciplinary in 1983, almost 26 years ago.

4             The Board's finding that petitioner lacks insight into his crime is similarly dated

5   as it evaluates petitioner's insight in 1977, not at the time of the Board hearing.  Indeed, Dr.

6   Rouse's 2003 report noted that petitioner

7                  admitted culpability for his life crime.  He stated that he has never
                  denied the offense and indeed was not defensive or [minimalizing]
8                  in his explanations to this examiner.  He stated that he is very sorry
                  that this happened and that he has no excuse for what happened.
9                  He stated that his life crime has affected the victim, the victim's
                  family, and his own family in turn.  He stated that he learned in the
10                 Victim Offender Reconciliation Group over the course of his years
                  of participation that such crimes as he committed have a
11                 reverberating effect on the families of everyone, all the members of
                  the victim's family, including the family of the perpetrator.
12

13  (Pet'r's Supp. Brief, at 12 [Docket No. 18 at 17-18].)  The Board also placed emphasis on

14  petitioner's effort to point out that in 1977 he hit the gentleman over the head with his hand and

15  used a toy pistol, not a real gun, to demonstrate petitioner lacked insight into "the point the

16  Governor was trying to make."  (Docket No. 20-4 at 92.)  As noted above, however, the Board

17  should not hold against petitioner his efforts to point out positives in a negative situation.  The

18  flip side of the Board's argument is that petitioner did not kill the second victim and he did not

19  use a lethal weapon, which demonstrates petitioner was not engaged in an escalating pattern of

20  violence from his commitment offense.

21            The fact that Dr. Rouse, one psychologist among many, failed to comment on

22  petitioner's gambling is not sufficient to support a finding that petitioner presents a present

23  danger to society.

24            Accordingly, this petition should also be granted as petitioner has served 23 years

25  beyond his minimum eligible parole date, Irons, 505 F.3d at 853, and the denial of parole was

26  based on the repeated and continued reliance solely on the unchanging factors of petitioner's

1   commitment offense and early incarceration, in violation of his due process rights and contrary to

2   rehabilitative goals.  These unchanging factors, when considered in light of other facts in the

3   record, have lost their ability to be predictive of current dangerousness.

4       B.  Case No. 04-cv-0584 MCE JFM

5       In this petition, petitioner challenges the 2002 denial of parole by the Board,

6   which was based primarily on three factors:  the commitment offense was "carried out in a cruel

7   manner, in a manner that demonstrates a disregard for human suffering"; "unstable social history

8   in that he was a gambler, and apparently, by all accounts, had a substantial problem[] with

9   gambling"; and (3) "the prisoner has not sufficiently participated in beneficial self-help

10  programs. . . the Panel concluded that it wasn't that you hadn't spent enough time in self-help,

11  but perhaps you weren't getting quite to the point. . . .  you never seemed to really get to your

12  innermost feelings.  That you just haven't gotten it."  (Docket No. 52 at 2, quoting Ex. A to First

13  Amended Petition, at 67-73.)  This denial of parole was the seventeenth denial of parole.

14      The last reasoned state court opinion addressing this petition was issued by the

15  Solano County Superior Court on April 18, 2003.  (First Amended Pet., Ex. G.)  The state court

16  found there was "some evidence" to support the Board's decision because the Board found that

17  the life offense was carried out in a cruel manner that demonstrates a disregard for human

18  suffering based on the gravity of the commitment offense, bludgeoning a seventy or seventy-five

19  year old man to death with a hammer, requiring a more lengthy period of incarceration.  (Id. at 2.)

20  The state court found petitioner failed to make a prima facie showing that the Board's finding

21  that petitioner had an "unstable social history in that he was a gambler" was arbitrary and

22  capricious.  (Id.)  The state court noted the Board's findings that petitioner had a substantial

23  problem with gambling; the commitment offense was related to gambling, the District Attorney

24  testified at the parole hearing that petitioner committed the murder to obtain money so petitioner

25  could gamble.  (Id.)  The state court found this provided "some evidence" to support its

26  conclusion petitioner had an unstable social history due to his gambling.

1       Finally, the state court found petitioner failed to make a prima facie showing that

2  the Board's determination that petitioner needs to participate further in self-help and therapy was

3  arbitrary and capricious.  (Id. at 2-3.)  The Board found that although petitioner had participated

4  in self-help programs, he could benefit from additional participation, and his insight into how

5  those programs affected him and how he should change as a result could be improved.  The state

6  court found this represented "some evidence" to support its finding that petitioner could benefit

7  from self-help and therapy.  (Id. at 3.)

8       As noted above, these findings do not demonstrate petitioner presents a current

9  risk of danger to the community; thus, the continued reliance on these unchanging factors

10  violates the due process clause.  Irons, 505 F.3d at 853; Biggs at 917.

11       In accordance with the above , IT IS HEREBY RECOMMENDED  that:

12       1.  Petitioner's applications for a writ of habeas corpus be granted; and

13       2.  Respondents be directed to forthwith set a parole release date for petitioner.

14       These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

16  after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

19  failure to file objections within the specified time may waive the right to appeal the District

20  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21  DATED:  February 3, 2009.

22

23                      UNITED STATES MAGISTRATE JUDGE

24

25  001; carr1870.157

26

43